**SPORCAM, INC., Plaintiff,**

v.

**GREENMAN BROS., INC., Defendant.**
**Civ. No. 11–360–C–2.**

United States District Court,
S. D. Iowa, C. D.
April 10, 1972.

Louís A. Lavorato, Des Moines, Iowa, of counsel, Williams & Hart, Des Moines, Iowa, for plaintiff.

Eugene Davis and Glenn L. Smith, Des Moines, Iowa, of counsel, Duncan, Jones, Riley & Davis, Des Moines, Iowa, for defendant.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This ruling is predicated upon defendant's Motion to Dismiss and Quash Service and plaintiff's Resistance to the same. The matter was heard on December 20, 1971. Plaintiff, Sporcam, Inc., is an Iowa corporation with its principal place of business in Iowa. Defendant, Greenman Bros., Inc., is a New York corporation with its principal place of business in New York. Plaintiff brought this action in state court, alleging breach of contract to purchase certain leaseholds of the plaintiff in Georgia and Florida. Defendant removed the action to federal court and immediately filed its Motion to Dismiss and Quash Service. Defendant asserts that the Court does not have jurisdiction over its person because Iowa Code Section 617.3, the contracts single act statute, was not intended to reach it under these particular facts. Defendant further asserts that it does not have sufficient minimum contacts with the State of Iowa to enable this Court to exercise *in personam* jurisdiction over it consonant with the due process principles of the Constitution of the United States.

## FACTS

From the pleadings and affidavits on file in this cause the following facts appear to be uncontested:

Defendant was not and is not qualified to do business in the State of Iowa, does not have any office or place of business in the State of Iowa, does not maintain any stock of goods or real property in the State of Iowa, and has no resident agent, servant or employee within the State.

In the fall of 1970 plaintiff's president went to New York to talk with the defendant for the purpose of obtaining an open line of credit with the defendant. During these negotiations, in November of 1970, defendant's president, a Mr. Bernard Greenman, and its vice-president, a Mr. Sidney Shotland, asked plaintiff's president if he would be willing to sell plaintiff company. The parties subsequently entered into negotiations on this matter, all face-to-face negotiations occurring outside of the State of Iowa. There were, however, several telephone and letter exchanges between plaintiff in Des Moines and defendant in New York, some of which were initiated by defendant in New York.

In January of 1971, plaintiff mailed to defendant in New York, at defendant's request, a copy of plaintiff's license agreements, additional financial information concerning the company, and a resume of each of plaintiff's managers.

The first draft of the sales contract was prepared in New York by defendant's attorneys and mailed to plaintiff's president in Chicago, where he was attending a meeting. Plaintiff's president took the proposed contract to Des Moines and reviewed it with plaintiff's attorneys. Plaintiff's attorneys called from Des Moines to defendant's attorneys in New York and discussed possible changes in the proposed agreement. Subsequently, in late February of 1971, defendant sent to plaintiff in Des Moines an amendment agreement. Plaintiff's president and its attorneys agreed to further changes, which changes were then agreed to by

defendant's attorneys through a telephone conversation between Des Moines and New York. The contract was entered into finally in New York on March 11, 1971.

The contract provided for the sale to the defendant of plaintiff's leasehold interest in license agreements pertaining to leased departments in stores of Bellex Department Stores, Inc., located in Marietta, Hapeville, and Chamblee, Georgia, and in Clearwater, Florida. In addition to proper instruments of title, plaintiff was to convey to defendant all books, records and data relating to the assets, properties, business, customers, and operations of the plaintiff pertaining to the leasehold interests. The purchase price to be paid to plaintiff was to be kept in a special account designated by defendant, such funds to be withdrawn only on the joint signature of an officer of the plaintiff and an officer of the defendant, and to be utilized solely to pay creditors of the plaintiff existing immediately following the contemplated closing. The closing of the sale was to take place in New York at a date to be established, after defendant received plaintiff's audited financial statements.

The plaintiff was required to warrant the following propositions: (1) that the transaction was authorized by the board of directors, unanimously approved by the shareholders, and was in compliance with applicable [Iowa] law, and that plaintiff has delivered to defendant documents certified by plaintiff's secretary attesting thereto; (2) that plaintiff had delivered an unaudited balance sheet and related unaudited statement of operations for the period ending December 27, 1970, and that plaintiff had had prepared by McGladrey, Hanson, Dunn & Company, certified public accountants, [the Des Moines branch of this firm had been plaintiff's accountant at all times previously], a balance sheet relative to the leasehold interests to be transferred for the ten-month period prior to February 28, 1971; (3) that plaintiff shall pay all its creditors the amounts owed to them as they become due; (4) that plaintiff,

after December 27, 1970, had made no transaction which would change its financial position, i. e., incurred no obligation or liability, fixed or contingent, except the obligations under the instant agreement and except trade or business obligations incurred in the ordinary course of business, none of which have had or would have an adverse effect upon the condition, financial or otherwise, of plaintiff's business; incurred no damage, destruction or loss, whether or not covered by insurance, adversely affecting its property or business; entered into no transactions other than in the ordinary course of business; mortgaged, pledged or subjected to lien, charge, security interest, or to any other encumbrance none of its assets or properties; and suffered no adverse change in its financial condition, properties or business; (5) that plaintiff had filed all tax returns and paid all taxes due to federal, state, and local governments; (6) that plaintiff owned or leased no other real property, except that listed in the agreement; (7) that plaintiff had delivered to defendant with respect to the leaseholds to be transferred all policies of insurance, all contracts and commitments to which plaintiff was a party, all employer-employee agreements, and the names and rates of pay of all employees; (8) that defendant has the right to cancel any open purchase orders for merchandise for the leaseholds, and in the event such orders cannot be cancelled, plaintiff must take shipment of such non-cancelled merchandise at its Des Moines store, and indemnify and hold defendant harmless against and from any liability for such merchandise; (9) that the plaintiff shall not and had not during the sixty days previous to the signing of the agreement transferred to the leaseholds any merchandise from its Des Moines departments; and, (10) that plaintiff had supplied to defendant (a) the aggregate gross sales figure of each leasehold proposed to be transferred since the commencement of operations thereof by plaintiff through December 27, 1970, (b) a complete and accurate itemization of all fixed assets and furniture and fixtures

of plaintiff at said leaseholds and the depreciated amount of each such item as carried on the books of plaintiff at February 28, 1971.

Plaintiff further agreed to give defendant and to defendant's counsel, accountants and other representatives full access throughout the period prior to the closing date to all of its properties, books, contracts, commitments and records and to furnish defendant during such period with all such information concerning plaintiff as defendant reasonably should request. Plaintiff agreed to cause to be prepared by McGladrey, Hanson, Dunn 3 Company a Balance Sheet as of February 28, 1971, and a Profit and Loss Statement for the ten-month period ending February 28th, 1971, for the leasehold interests proposed to be transferred, which Balance Sheet and Profit and Loss Statement was to be audited and was to contain the opinion of the accountants that the financial statements had been prepared in accordance with generally accepted accounting principles and made on a basis consistent with that of prior years, and fairly present the financial position and results of operations of plaintiff for such leasehold interests at the date and for the period indicated.

Plaintiff further agreed to conduct its business in the following manner: (1) to operate its business only in the usual, regular and ordinary manner, and to the extent consistent with such operation, to use its best efforts to preserve its then existing business organization and to preserve its then existing relationships with persons having business dealings with it; (2) to deposit all cash received on and after March 1, 1971, and up to the closing date, in connection with the leasehold interests proposed to be transferred, in bank accounts mutually agreeable to the parties, with withdrawals made only on the joint signatures of plaintiff's president and defendant's president or other representative; (3) to forward to defendant on and after March 1, 1971, all proposed purchase orders prior to forwarding them to vendors, with defendant having the right to veto all such pur-

chase orders; (4) that all cash receipts arising out of the operation of the leaseholds to be transferred, deposited in accordance with the provisions of the contract, are to be utilized solely for plaintiff's payroll, petty cash and ordinary and necessary expenses incurred on and after March 1, 1971, up to the closing date, and further that such cash receipts could also be utilized for the payment of any trade accounts payable to be assumed pursuant to the agreement by defendant; (5) to forward copies of Merchandise Received and Receiving Reports, Purchase Invoices and Expense Invoices, and Intrastore Transfer and Markdown Reports, immediately upon receipt thereof during the period March 1, 1971, up to the closing date; (6) to maintain its books, accounts and records in the usual, regular and ordinary manner on a basis consistent with prior years and to perform all of its obligations in the conduct of its business without default; (7) to make no modification or change in any existing lease, contract or commitment; (8) to make no transaction out of the ordinary course of business; (9) to purchase no fixed assets, and to make no borrowings; and (10) to make no increase in compensation to any officer, employee or agent, to declare no dividends or to make no other distribution to shareholders, and to make no other payment unless in discharge of salaries or commissions or services rendered to closing date or in discharge of liabilities reflected on its balance sheet of February 28th, 1971.

The plaintiff further had to fulfill the following conditions: (1) plaintiff must have delivered to the defendant a certificate of plaintiff's president dated as of the closing date to the effect that plaintiff had fulfilled all conditions specified in the contract; (2) plaintiff must have caused defendant to have received through defendant's counsel such documents of consent by parties to contracts with plaintiff as were necessary to the consummation of transactions contemplated by the agreement, and for defendant to carry on the business transacted

in the leaseholds to be transferred; (3) plaintiff must have delivered at or prior to the closing date in form satisfactory to defendant's counsel the approval of the Small Business Administration and the Highland Park State Bank of Des Moines to the sale by plaintiff covered by the agreement, and plaintiff must have obtained a release of the lien filed with respect to the term loan agreement between plaintiff and the above institutions on the assets being sold and transferred according to the agreement and appropriate agreement by such lending institutions waiving any rights against defendant for the transferred assets by reason of the sale and transfer of assets contemplated in the agreement; (4) plaintiff must have delivered a certificate executed by plaintiff's president to the effect that a search had been made of both the appropriate central and local filing offices of the State of Iowa, Georgia, and Florida, and any other states in which plaintiff transacted business, or in which the assets to be transferred in accordance with the agreement were located, and that the only liens, encumbrances or conditional sales on file were those attached to such certificate; and, (5) plaintiff must have delivered at or prior to the closing date a list setting forth all creditors of plaintiff as of the day following the closing date, enumerating the name, address, and amount due each creditor and date or dates each such amount is due.

Plaintiff and its stockholder [an Iowa citizen] further agreed that from and after the closing date neither would (unless acting as an officer or employee of defendant or with defendant's prior written consent) for a period of ten years from the closing date directly or indirectly own, manage, operate, join, control or participate in the ownership, management, operation or control of or be connected in any manner with any business that at that time had or during such period does enter into a license agreement for a lease department with Bellex Department Stores, Inc., its parent company, subsidiaries or any suc-

cessors thereto except the present departments in the Des Moines, Iowa, Bellex store. The agreement provided that all notices, requests, demands, and other communications required or to be given under the agreement were to be in writing and were to be mailed, if to plaintiff to its Des Moines, Iowa, office. The agreement was to be governed and construed in accordance with the law of the State of New York. In the event of any dispute or disagreement between the parties arising out of the agreement which the parties were unable to adjust or resolve within a period of ten business days, such dispute or disagreement was to be submitted to arbitration in New York City, New York.

Pursuant to the requirements of Greenman Bros., Inc., plaintiff's president engaged the firm of McGladrey, Hansen, Dunn & Company, Des Moines, Iowa, to perform certain auditing procedures, prepare financial statements, and render opinions thereon. On or about March 3, 1971, Kent Klopfenstein and Michael Wheeler of the firm of McGladrey, Hansen, Dunn & Company accompanied plaintiff's president on a trip from Des Moines, to visit the departments operated by plaintiff in Florida and Georgia and meet with representatives of Greenman Bros., Inc. During the visit Mr. Klopfenstein and Mr. Wheeler performed certain auditing and accounting work at the departments. On behalf of plaintiff they removed certain records, supplies, catalogs, etc. from said departments and turned over control of said departments to defendant. The records, supplies, catalogs, etc. were returned by them to the office of plaintiff. Thereafter, the employees of plaintiff in Des Moines and Mr. Klopfenstein and Mr. Wheeler performed certain work at the offices of plaintiff in Des Moines necessary to the preparation of the financial statements required by Section 5.2 of the contract.

Pursuant to Section 5.3(d) of the contract all purchase orders, the same having been prepared at the offices of plaintiff, were submitted to representatives of de-

**1174**

fendant for approval or veto. The officers, directors and stockholders, all of whom were Iowa residents, refrained from taking any action which might violate Sections 5.3(h), 5.3(k) and 5.3(l) of the contract.

Attorneys for plaintiff were retained and prepared and supervised the preparation of certain documents required by the contract, all such services being performed in Des Moines.

On or about April 21, 1971, representatives of defendant, to-wit: Sidney Shotland, Vice President, and Bernard Mentz came to Des Moines and conferred with plaintiff's president, Kent Klopfenstein, and Michael Wheeler. During such visit to Des Moines Mr. Shotland and Mr. Mentz reviewed the work papers of Mr. Klopfenstein and Mr. Wheeler and accounting statements, accounting records, invoices, purchase orders and systems of plaintiff at its offices in Des Moines. The same representatives of defendant met with plaintiff's president and Mr. Charles Grochala, Executive Vice President, Highland Park State Bank, at the offices of Highland Park State Bank in Des Moines.

Pursuant to Sections 5.3(b) and 5.3(e) of the contract, all cash received on and after March 1, 1971, from the operation of the departments being purchased thereby was deposited in bank accounts subject to withdrawal therefrom only on the joint signatures of plaintiff's president and Bernard Greenman or other representatives of defendant. Payroll and other checks relating to those departments thereafter were prepared and signed by plaintiff's president at the office of plaintiff in Des Moines and forwarded by mail to defendant for counter-signature by its representative.

Pursuant to Section 2.3 of the contract, plaintiff's president set up an interim account at the Highland Park State Bank for the deposit of the cash consideration to be received under the contract and representatives of defendant gave telephonic approval thereof. As required by the aforesaid Section 2.3, the terms of the interim account were to allow withdrawals therefrom only upon the dual signature of an officer of plaintiff and an officer of defendant.

Pursuant to Section 6(g) of the contract, plaintiff's president conferred with Mr. Charles Grochala of the Highland Park State Bank on several occasions and obtained written approval of the transaction as set forth in the contract and release of the lien, the same having been filed only in the State of Iowa, all of which took place in Des Moines, Iowa.

Sometime shortly subsequent to April 21, 1971, defendant elected to terminate the contract and not go forward with purchasing the Georgia and Florida lease departments. On July 16, 1971, this instant action was instituted wherein plaintiff prays for $1,150,000 actual damages and $500,000 punitive damages for alleged breach of contract and for allegedly causing plaintiff to become insolvent.

I.

The Court notes at the outset that there has been no question raised in regard to compliance with the procedural provisions of Iowa Code § 617.3, the Iowa single act statute, or in regard to the adequacy of notice of the defendant thereunder. Thus, the first question before the Court is whether there is *in personam* jurisdiction over the defendant under § 617.3. Section 617.3 of the Iowa Code provides in part as follows:

"If a foreign corporation makes a contract with a resident of Iowa to be performed in whole or in part by either party in Iowa, * * * such acts shall be deemed to be doing business in Iowa by such foreign corporation for the purpose of service of process or original notice on such foreign corporation under this section, and, if the corporation does not have a registered agent or agents in the state of Iowa, shall be deemed to constitute the appointment of the secretary of state of the state of Iowa to be its true and lawful attorney upon whom may be served all lawful process or original

notice in actions or proceedings arising from or growing out of such contract. * * *."

The applicability of the state "long arm" statute to a particular case is a question of state law. Midwest Packaging Corp. v. Oerlikon Plastics, Ltd., 279 F.Supp. 816, 818 (S.D. Iowa, 1968); Jennings v. McCall Corp., 320 F.2d 64 (8th Cir. 1964); Simpkins v. Council Mfg. Corp., 332 F.2d 733 (8th Cir. 1964). Iowa law dictates that the Court must accept the allegations of the complaint as true. The plaintiff has the burden of sustaining jurisdiction under § 617.3, but once it has made a prima facie case, the burden is on the defendant to produce evidence to rebut or overcome the prima facie showing. Rath Packing Co. v. Intercontinental Meat Traders, Inc., 181 N.W. 2d 184, 185 (Iowa, 1970); Miller v. Vitalife Corp. of America, 173 N.W.2d 91, 92 (Iowa, 1969); Tice v. Wilmington Chemical Corp., 259 Iowa 27, 34–35, 141 N.W.2d 616, 621–622, 143 N.W.2d 86 (1966). Under the facts of this case the plaintiff has made a prima facie case merely by showing *the existence* of a contract to be performed "in whole or in part" within the state of Iowa. *Rath,* supra, 181 N.W.2d at 186, *citing* Midwest Packing Corp. v. Oerlikon Plastics, Ltd., supra, 279 F.Supp. at 818. The facts of this case are stronger than those in the case of Miller v. Vitalife Corp. of America, supra, 173 N.W.2d at 94, which held that there was compliance with § 617.3.

In connection with the problem of personal jurisdiction under § 617.3, the Court notes two arguments made by the defendant with respect to the problem of due process of law. The first problem concerns the seller-buyer distinction articulated in the *Rath* case in connection with the discussion of the Supreme Court of Iowa of due process. There the Court held that a stronger case for *in personam* jurisdiction is made out when a resident

buyer is suing a non-resident seller, rather than when a resident seller is suing a non-resident buyer. The *Rath* case cites a Minnesota case,[1] which makes the seller-buyer distinction with respect to *in personam* jurisdiction under the single act statute. The Court notes, however, that the Supreme Court of Iowa has used this criterion only relative to the due process argument and not as it pertains to the single act statute. *Rath,* supra, 181 N.W.2d at 188.

Defendant further cites in its brief in support of its due process argument the legislative explanation attached to H. F. 576, 59 G.A. (1961) which became § 617.-3 of the 1962 Iowa Code. This explanation reads:

> "Our present 'process agent' statute is ineffective to secure service of notice and jurisdiction on companies who sell products in the State of Iowa, and for that reason no jurisdiction can be secured over the manufacturing company. This bill will provide that the Secretary of State would be the agent upon whom service of notice can be made to secure jurisdiction over such foreign corporations in contract and negligence cases where presently they are unable to get service."

If this legislative history were the only explanative material before the Court, it would be compelled to further examine the buyer-seller rationale above. The case of Miller v. Vitalife, supra, 173 N.W. 2d 94, clearly indicates, however, that § 617.3 is satisfied under the facts of this case and that the buyer-seller distinction has no applicability in Iowa with respect to the single act statute.

## II.

The Court thus turns to defendant's allegation that it would be violative of the due process provision of the Constitution of the United States for the Court to exercise *in personam* jurisdic-

---

1. Fourth Northwestern National Bank of Minneapolis v. Hilson Industries, Inc., 264 Minn. 110, 117 N.W.2d 732, 735 (1962). See the discussion of this line of Minnesota cases in Electro-Craft Corp. v. Maxwell Electronics Corp., 417 F.2d 365, 368 (8th Cir. 1969).

tion over it. The issue of the constitutionality of the Court's *in personam* jurisdiction over the defendant, Greenman Bros., is a federal question, and the Court has a duty to make an independent inquiry and determination as to this issue. Aftanase v. Economy Baler Co., 343 F.2d 187, 192 (8th Cir. 1965). The Iowa decisions as they pertain to due process under the 14th Amendment are of weight, but they are not binding upon a federal court. *Id.* at 193.

An examination of the leading cases in the Supreme Court of the United States reveals the following applicable law pertaining to this problem:

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Company v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

"Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them

can, in most instances, hardly be said to be undue." *Id.*

"It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

"The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

"The amount and kind of activities which must be carried on by the foreign corporation in the State of the forum so as to make it reasonable and just to subject the corporation to the jurisdiction of that state are to be determined in each case." Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1951).[2]

■■ The Court of Appeals for the Eighth Circuit has abstracted from these decisions five factors to be considered in determining whether the fair play and substantial justice requirements are satisfied in any case: (1) the nature and quality of the contacts of forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Electro-Craft Corp. v. Maxwell Electronics Corp., 417 F.2d 365, 368 (8th Cir. 1969);

2. This summary of the case law is taken from Rath Packing Co. v. Intercontinental Meat Traders, Inc., 181 N.W.2d 184, 187–188 (Iowa, 1970) (Stuart, J.). For an excellent discussion of these cases see Aftanase v. Economy Baler Co., 343 F.2d 187, 195–197 (8th Cir. 1965) (Blackman, J.).

*Aftanase,* supra, 343 F.2d at 197. After a careful analysis of these factors, the Court concludes that the exercise of jurisdiction in this instance is consistent with the Constitutional requirements of due process.

█ The quality and quantity of activities conducted by the defendant in this state are clearly sufficient to satisfy due process standards. The test of quality of activity is satisfied when the defendant reasonably could have anticipated that the activities would have consequences in a forum state. *Aftanase,* supra, 343 F.2d at 197. The fact that a defendant conducts voluntary, affirmative economic activity of substance is a significant factor in determining that the due process standards are complied with. *Id.* The Court can look to future activity contemplated in the contract for the purpose of determining defendant's contacts with the forum state. *Midwest,* supra, 279 F.Supp. at 819. And when determining the significance of the quantity of contacts defendant has with the forum state, the Court must assess realistically the number of contacts that a firm would have in carrying on the business at issue. The firm does not have to carry on business continuously and systematically in the state, but the contacts should be more than an isolated instance of activity in the state. *Aftanase,* supra, 343 F.2d at 197.

Here the defendant purposely availed itself of the privilege of doing business with an Iowa resident. It entered into a transaction having substantial impact on the commerce of this state. Among the facts significant in this respect to the Court are: (1) that the contract contemplated nearly complete control of all activity of the plaintiff Iowa-based corporation by defendant for a substantial period of time; (2) that the contract imposed upon plaintiff the obligation to carry on substantial activity in Iowa to facilitate the transfer of the assets involved; (3) that the contract required plaintiff to employ an Iowa accounting firm; (4) that the contract required the plaintiff to seek a release from an Iowa-based creditor bank; and, (5) that the contract included a covenant in which plaintiff agreed not to compete with the defendant in any place in the Union, with the exception of certain existing locations in Des Moines, which prohibition would pertain to any other location within the State of Iowa. By doing so, defendant invoked the benefit and protection of Iowa laws and reasonably could have anticipated that its action would have consequences in Iowa. The fact that there was no actual entry into the state by any agents of the defendant is not of controlling significance. *Electro-Craft Corp.,* supra, 417 F.2d at 369. Many acts required of the plaintiff under the contract were to be performed in Iowa and defendant would have had to use Iowa courts to enforce the obligations under the contract. See *Electro-Craft Corp.,* supra, 417 F.2d at 369. The transaction cannot be considered a New York one as defendant alleges, even though the contract specified that New York law was to apply and that any dispute would be subject to arbitration in New York. Rather, the contract was of an interstate nature with activities conducted in and through many states. See *id.* And although defendant has not carried on a continuous and systematic course of activity in the State of Iowa, the activity contemplated by the contract must be characterized as substantial by any test as it involved virtually all of the plaintiff's Iowa corporation's assets. Thus, one could not reasonably contemplate a more continuous course of dealing under the circumstances of this case.

It is self evident that this cause of action has risen out of defendant's contacts with an Iowa resident. The Court of Appeals for the Eighth Circuit has held in many instances that the considerations just analyzed are the key factors in determining whether due process standards are complied with. Kulm v. Idaho First Nat. Bank, 428 F.2d 616, 619 (8th Cir. 1970); Thompson v. Ecological Science Corp., 421 F.2d 467 (8th Cir. 1970); *Electro-Craft,* supra; *Aftanase,* supra. Because of the signifi-

cance that the Supreme Court of Iowa has placed upon the interest of the forum as a significant factor in determining due process, the Court must examine this factor in some detail. Defendant cites Rath Packing Co. v. Intercontinental Meat Traders, Inc., 181 N.W.2d at 188, for the proposition that Iowa courts would not find due process requirements satisfied because it is a non-resident buyer. *Rath* states:

"When the action is against a non-resident buyer, plaintiff must show there were sufficient minimum contacts as required by the rules heretofore mentioned. If the action is against a non-resident seller, plaintiff can also rely on the rule that an act outside the forum state which produces consequences in that state is sufficient to give it judicial jurisdiction."

A further examination of *Rath*, however, reveals that the Court was talking about a non-resident buyer in the ordinary course of business. The Supreme Court distinguished the *Rath* fact situation from the facts of Miller v. Vitalife Corp., 173 N.W.2d 91, 94–95 (Iowa, 1969), in which jurisdiction over a non-resident buyer was sustained for the reason that the *Miller* transaction was a bulk sales transaction, a sale of assets out of the ordinary course of business. *Rath*, supra, 181 N.W.2d at 189. This instant case is clearly a bulk sales case within the contemplation of Article VI of the Uniform Commercial Code under any jurisdiction wherein any of the dealings involved took place. *See* Florida Statutes, §§ 676.6–101 et seq., F.S.A., Georgia Code, Title 109A, Article VI; Iowa Code, §§ 554.6101 et seq.; McKinney's Uniform Commercial Code, Section 6–101 et seq. (New York). Noting the remarkable similarity between the *Miller* facts and the facts in this instant case, the Court has no trouble in concluding that the Supreme Court of Iowa would find jurisdiction in this case.

■ The factor of convenience of the parties is not of great weight in the due process cases, except when other factors are equivocal. *Aftanase,* supra, 343 F.2d

197. The Supreme Court of the United States has held this factor to be of minute significance. McGee v. International Life Ins. Co., 355 U.S. 220, 224, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). While rendering no opinion that this forum would be the most convenient forum under a 28 U.S.C., § 1404(a) analysis, the Court has no problem in concluding that any inconvenience the defendant would suffer by defending his suit in Iowa is not a violation of due process of law.

Accordingly, it is ordered that defendant's Motion to Dismiss and Quash Service be, and the same hereby is, overruled and denied.

It is further ordered that plaintiff's Motion to Strike be, and the same hereby is, overruled and denied for reason of mootness.